**UNITED STATES of America**

v.

**Glen E. SLAYMAN.**

**Crim. No. 83–28.**

United States District Court,
W.D. Pennsylvania.

July 23, 1984.

John P. Panneton, Asst. U.S. Atty., Pittsburgh, Pa., for plaintiff.

H. David Rothman, Pittsburgh, Pa., for defendant.

## MEMORANDUM

MARSH, District Judge.

The defendant, Glen E. Slayman, has filed a motion to vacate sentence alleging ineffective assistance of counsel. Slayman was convicted by a jury on June 23, 1983 of fifteen (15) counts of mail fraud in violation of 18 U.S.C. § 1341 and three (3) counts of transporting an individual in interstate commerce in execution of a scheme to defraud in violation of 18 U.S.C. § 2314. On September 6, 1983 he was sentenced to five (5) years imprisonment on each count to run concurrently.

Slayman was a building contractor operating through his own company, Arrow Engineers and Consultants, Inc. He devised a scheme to defraud churches of money by promising the pastors of said churches or other members of the congregation that he could obtain funds to pay for proposed construction utilizing his contacts at the Mellon Foundation of Pittsburgh. Defendant obtained in excess of $140,000

from twelve churches or church organizations by way of his fraudulent representations.

This was done by a well thought out scheme over a period of approximately six (6) years. Slayman, who purported himself to be a born-again Christian and church builder, actively sought out churches who were in need of funds to finance construction of churches, schools and other church-related buildings. Using the techniques of an accomplished con-artist, Slayman made representations to ministers, church representatives, and congregation members that he possessed the expertise and ability to obtain funding for all proposed construction projects. In particular, he professed to have a contact who had influence with the Mellon Foundation and who could obtain grants from said Foundation to finance church construction projects. In fact, his contact with the Mellon Foundation was a teller who worked at a branch office and had no connection with the Foundation or any expertise in obtaining funding. Defendant also represented he had contacts with an attorney who sat on the board of the Mellon Foundation. This representation was a complete falsehood.

It was further part of the scheme to defraud that Slayman represented to the churches that he had an architect with influence with the Mellon Foundation and that architectural drawings were absolutely necessary before a grant could be considered for a construction project. In fact, the architect involved shared business offices with Slayman and Slayman received all the money paid to said architect.

A percentage of the cost of the construction project had to be obtained from each church to pay for architectural drawings. It was through this method of obtaining a fee for architectural drawings that Slayman was able to collect over $140,000. In fact, construction was never accomplished and Slayman utilized delay tactics when he was questioned by the various church organizations as to when they would receive their grants.

Defendant's primary ground to support his motion to vacate is an assertion that his trial counsel knew or should have known that "the conduct which led to the indictment in this case was the product of mental disease or illness and that *the defense of insanity should have been asserted.*" (Emphasis supplied.)

Hearings were held on this issue on March 7 and March 26, 1984. Subsequent to said hearings, the parties stipulated that sentence should be vacated pending the outcome of a ninety (90) day study at the United States Medical Center for Federal Prisoners. The defendant was, therefore, committed to the Medical Center at Springfield, Missouri, for evaluation of his current and prior mental status. Accordingly, on April 5, 1984, the court entered an order staying a ruling on defendant's motion to vacate until such time as the court had an opportunity to review and consider a report from Springfield Medical Center. Said report was received by the court on July 16, 1984.

After review of the report, the transcripts of hearings held on the motion to vacate and consideration of the files and records of this case, the court makes the following findings of fact and conclusions of law:

As has been stated above, the primary issue to be considered in this matter is whether defendant's counsel knew or should have known that the conduct which led to the charges against defendant was the product of mental disease or illness. In addressing ourselves to this issue, we look to the hearing testimony and the report from Springfield Medical Center.

### Testimony of Defense Counsel

The testimony of defendant's counsel, Samuel Orr, reveals the following. Defendant's counsel has been an attorney since October, 1966 and has therefore been in practice almost eighteen years. His practice concentrated initially on the defense in criminal cases until January, 1968, when he was appointed an Assistant District Attorney in Beaver County, Pennsyl-

vania. In September, 1969, Mr. Orr was appointed as an Assistant United States Attorney in the Western District of Pennsylvania and served in this post until September, 1977, at which time he returned to private practice specializing in criminal law.

His representation of the defendant in this case began with a consultation in 1980 when defendant's bank records were subpoenaed from Mellon Bank. Prior to indictment in this matter, Mr. Orr spent approximately ten hours in meetings with the defendant discussing the probability of indictment and potential litigation.

Subsequent to the indictment, Mr. Orr had an initial meeting with defendant and his wife for approximately four and one-half hours. After said initial meeting, Mr. Orr met with defendant two or three times a week for periods ranging from one to two hours. These meetings continued from the time of indictment, March 2, 1983 to the commencement of trial on June 13, 1983. Mr. Slayman would supply his counsel with documents and statements for use in his defense and then meetings were held to discuss these documents after counsel had reviewed them in light of the indictment.

Prior to trial, defendant made no indication to his counsel that he was under treatment or taking medication for a mental condition. Counsel knew defendant to have a business reputation of being successfully and gainfully employed in his own business for approximately thirty (30) years. Furthermore, neither defendant nor his wife volunteered information to counsel that defendant had a prior history of a mental condition.

In addition, it was counsel's testimony that defendant exhibited no behavior which would raise a question in counsel's mind that defendant was suffering from any mental disease, defect or disorder. Counsel further testified that he found his client to be direct in denying the charges against him, responsive to the major issues in the case, and knowledgeable of which witnesses could help him and which witnesses could hurt him in his defense. Counsel did notice that defendant's ability to respond deteriorated somewhat, but attributed this to defendant's failure to get adequate sleep and the pressure a criminal trial imposes on a defendant. Counsel further could draw no conclusions or suspicions that there was something mentally wrong with defendant after his direct testimony and cross-examination.

With respect to asserting an insanity defense, counsel, who had experience in utilizing an insanity defense, did not believe that Mr. Slayman was a person who exhibited characteristics which would make such a defense feasible. Further, counsel found defendant very helpful to him in preparation of the defense in the case.

In short, nothing prior to or during the trial led defense counsel to conclude his client was suffering from any mental condition. In addition, the court and its staff gleaned no hint from defendant's demeanor during the trial which indicated the presence of any mental disorder. The defendant was long-winded in answering questions, at times unresponsive, had a tendency to exaggerate and utilize the puffery attendant to a person who was a hard seller and fast talker. But his answers to questions did not exhibit a mental disorder, disease or condition. Defendant was not unlike many other mail fraud violators this court has tried who were able to use hard sell, their powers of persuasion and abilities as accomplished con-artists to dupe unknowing and gullible victims of their money. The defendant's scheme to defraud was well conceived and required considerable organization and business acumen.

### Testimony of Dr. Bowman

At the hearings, defendant called Dr. Robert Bowman, a specialist in psychiatry and a psychiatric consultant for the Allegheny County Behavior Clinic—an arm of the Court of Common Pleas of Allegheny County, Pennsylvania. Defendant was seen by Dr. Bowman on December 12, 1983 and January 3, 1984. After his first examination with defendant, Dr. Bowman ordered a social history and a psychological assessment. The social history taken of

Mrs. Slayman indicated she was aware of no past psychiatric treatment for her husband. Since the indictment, Mrs. Slayman had observed her husband to be more nervous, restless and agitated.

The psychological assessment performed by L.V. Pacoe, a clinical psychologist, indicates that defendant is attempting to repress undesirable effects such as depression. "In addition, the denial appears to be supported by an ego inflation in which he is attempting to bolster his sense of self-esteem." The personality inventory (MMPI) [1] indicates a severe pathological disturbance consistent with a diagnosis of paranoid schizophrenia.

With the aid of the reports ordered by Dr. Bowman, he prepared a report and testified that it was his opinion that defendant was presently suffering from a bipolar disorder sometimes characterized as a manic-depressive state. He recommended hospitalization and treatment with lithium carbonate. Dr. Bowman could not render an opinion on the length of time defendant has suffered from a mental illness and, therefore, could not say he lacked substantial capacity to conform his conduct to the requirements of the law at the time he committed the crimes for which he was convicted.

### Report of 90-day study

Since Dr. Bowman's opinion testimony was inconclusive on the length of time of defendant's mental illness, the court, with the agreement of the parties, ordered a 90-day study to be performed at the United States Medical Center at Springfield, Missouri.[2]

Considering the length of time defendant was under observation, we consider the report to carry much greater weight as compared to the two visits defendant had with Dr. Bowman. The Medical Center had an opportunity to review Dr. Bowman's reports and all of the reports which were

available to Dr. Bowman. The study's purpose was to obtain a report on defendant's present and past mental status. The report indicates that defendant's present mental status suggests that he has a neurotic adjustment to life characterized by mild depression, anxiety, repression and hypochondriacal complaints. The report could make no conclusion on defendant's past mental status.

Portions of a psychological report indicate the following:

"He was oriented to time and place, person and situation. His flow of speech was coherent and circumstantial. Although responses to questions were relevant, they were long and detailed. There was some difficulty in responding directly to the point of a question.... Memory for recent and past events was intact. Affect was appropriate in fluctuations and intensity. Mood was serious and intense.... Mr. Slayman admitted to being depressed after he fell off the scaffold in 1980 due to his numerous physical complaints and inability to work. He stated he was depressed upon admission to the Medical Center on his present study due to his legal predicament and physical ailments. Slayman denies any depression and also feels he is much more mentally alert since his physical ailments have improved. He did not appear to be presently depressed or elated. Energy level was within normal limits."

After a number of tests, including two MMPI tests, the results were interpreted as follows:

"The second profile suggests an individual who utilizes repression and denial and who is rather rigid and has a poor tolerance for stress. He would tend to have a naive and hysterical perspective on life.... The profile suggests mild depression, anxiety and tension, along with feelings of social and emotional alienation characteristic of a schizoid level

---

1. Minnesota Multiphasic Personality Inventory.

2. Ordering such a study was consistent with Dr. Bowman's testimony that his opinion would

have been aided by hospital records and the observations of doctors and nurses.

of adjustment. Present psychological testing indicates a neurotic profile with a possible underlying psychosis. It is possible that the above characteristics would be exaggerated, and the patient would decompensate into psychosis. *Presently, adequate reality contact is maintained and Mr. Slayman is not actively psychotic.*" (Emphasis supplied.)

The final psychiatric study section of the report provides the following information:

"The initial diagnostic impression was adjustment disorder with depressed mood.

"Mr. Slayman, at the time of admission to this institution, was taking large doses of Tranxene and Valium. These two drugs are classified as minor tranquilizers and they might have caused the increase of his depression. His Valium was discontinued. His tranxene was changed to 7.5 milligrams po four times a day, if necessary. He was started on Elavil-25 milligrams po at bedtime for his depression. During the subsequent interviews, Mr. Slayman showed gradual but progressive improvements.... He presently takes Elavil-25 milligrams po at bedtime. This should be continued for five more months.

"FINAL DIAGNOSIS: Adjustment disorder with depressed (improved)."

What the report did not find appears to be as significant as what was found. There was no finding of a mental disorder, disease or condition requiring hospitalization. Further, nothing in the report indicates a past or present state of incompetency. Nor was there a conclusion on the existance of a long term mental illness which would support a defense of insanity. There was no finding of any debilitating health problem either physical or mental.

### Conclusions of Law

Where ineffective assistance of counsel has been asserted as a ground for a motion to vacate, this court has in the past been guided by a number of Third Circuit opinions including *Moore v. United States*, 432 F.2d 730 (3rd Cir.1970); *United States v.*

*Williams*, 631 F.2d 198 (3rd Cir.1980); *United States v. Baynes*, 687 F.2d 659 (3rd Cir.1982).

The standard in the Third Circuit, in the above cases and others, has been to analyze counsel's representation to determine if counsel exercised "the customary skill and knowledge which normally prevails at the time and place." However, the Supreme Court of the United States has recently spoken on the ineffective assistance of counsel issue in *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

A number of guidelines enunciated in *Strickland* are helpful in analyzing ineffective assistance. The court, for example, stated:

"[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.... At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all decisions in the exercise of reasonable professional judgment." (—— pp. —— – ——, 104 S.Ct. 2065–2066.)

■ Considering these guidelines and applying them to the facts of this case and the record of hearings on the issue of ineffective assistance, which was initially outlined earlier in this opinion, we cannot say that counsel's performance was deficient. The record shows that defendant's counsel had no factors brought to his attention which would cause him to explore his client's sanity. His client was very helpful to counsel in preparing the defense and indicated nothing to counsel to key any inquiry into defendant's mental condition. With hindsight, we can see that the report from the United States Medical Center supports counsel's experienced assessment of his client. Counsel had the opportunity before trial to consult with defendant and his wife on numerous occasions prior to trial and thus was afforded ample opportunity to observe defendant. He also had the benefit of knowing defendant's business

reputation in the community. In short, counsel exercised reasonable professional judgment, in light of his experience in criminal law and the use of an insanity defense, in not questioning his client's mental well-being. In his testimony concerning evaluating a client's mental status counsel stated:

"When someone comes in ... to the office, what I do is, first of all, I evaluate them myself to see whether or not it's—obvious to me that there's a problem. If there is that kind of situation, I will refer them to a psychiatrist for examination. I did not feel, from talking to Mr. Slayman, that that was appropriate."

We consider this a statement of sound professional judgment and not deficient performance by counsel.

Since we do not feel that defendant has borne his burden of establishing deficient performance by his counsel, we need not address ourselves to the second part of the *Strickland* test—prejudice to the defense.

We have also reviewed a line of cases, all decided prior to *Strickland, supra,* which dealt with the issue of counsel failing to utilize an insanity defense.

For example, in *Lee v. Wainwright,* 457 F.2d 771, 772 (5th Cir.1972), a state prisoner who filed for habeas relief under 28 U.S.C. § 2254(a), asserted he was mentally incompetent at the time of trial and that his attorney should have raised the defense of insanity. The court held that:

"[t]he decision of petitioner's counsel not to pursue the defense of insanity at trial falls within the realm of trial counsel's strategy.... The rule is that effective counsel does not mean errorless counsel or counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance."

In *Harkins v. Wyrick,* 552 F.2d 1308 (8th Cir.1977), the court determined that counsel had no knowledge of Harkins' mental problems until the day set for trial. There was also testimony that Harkins cooperated fully in the preparation of his defense and understood the charges against him.

The court held that under said circumstances, the use of defenses other than incompetency was not a failure to exercise "the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *Harkins, supra,* at 1313. The court went on to say that petitioner made no showing of prejudice from the failure to investigate a possible competency defense.

We do not feel that the above decisions contradict the Supreme Court's opinion in *Strickland, supra.* We are also convinced that failure to present an insanity defense can be ineffective assistance, but under all of the facts and circumstances of this case, we cannot say counsel rendered anything but a competent, complete, thorough and reasonable defense of his client. The record is clear and the evidence heavily preponderates against any conclusion that defendant is presently incompetent or that he was incompetent throughout the six year period over which his intricately devised scheme to defraud existed and was successfully executed.

In light of the record and the guidance of *Strickland,* we are convinced defendant's motion to vacate and motion for new trial should be denied.

■ In addition, the defendant has presented a motion for new trial for after discovered evidence, i.e., that the evidence is substantial that defendant was suffering from a mental disease, defect or disorder which should have prompted the assertion of the defense of insanity.

The defendant also presented a motion for new trial because the defendant was not competent to stand trial.

For the reasons heretofore stated, both motions will be denied. The defendant was well organized and equipped to defraud churches of over $140,000 during the 1970's and early 1980's and he was eminently capable of assisting his well qualified counsel during his trial.

We find as a fact that he was competent to stand trial and his counsel had no reason to suspect otherwise.

Appropriate orders will be entered.