767 F.2d 998
 1985 A.M.C. 2617, 247 U.S.App.D.C. 208
 TRANSAMERICAN STEAMSHIP CORPORATION
v.
SOMALI DEMOCRATIC REPUBLIC Somali Shipping Agency, Appellants.
TRANSAMERICAN STEAMSHIP CORPORATION, Appellant
v.
SOMALI DEMOCRATIC REPUBLIC, et al.
 Nos. 84-5524, 84-5542.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 14, 1985.
Decided July 12, 1985.
As Amended July 17, 1985.
 
 Appeals from the United States District Court for the District of Columbia (D.C.Civil Action No. 82-2043).
 Daniel J. O'Callaghan, New York City, for appellant Somali Shipping Agency in No. 84-5524 and appellees Somali Democratic Republic, et al., in No. 84-5542. Martin R. Ganzglass, Washington, D.C., also entered an appearance for appellant/cross-appellees.
 Reuben B. Robertson, III, Washington, D.C., for Transamerican Steamship Corporation, appellee in No. 84-5524 and appellant in No. 84-5542.
 Before WRIGHT, TAMM, and WALD, Circuit Judges.
 Opinion for the court filed by Circuit Judge TAMM.
 Opinion concurring in part and concurring in the judgment filed by Circuit Judge WALD.
 TAMM, Circuit Judge:
 
 
 1
 Transamerican Steamship Corporation ("Transamerican") brought an action in the district court for declaratory and monetary relief against the Somali Democratic Republic ("SDR") and the Somali Shipping Agency ("the Agency"). The district court held, inter alia, that it had subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. Secs. 1330, 1602 et seq. (1982), to adjudicate Transamerican's claim against the Agency, but that it lacked subject matter jurisdiction with respect to the SDR. The Agency and Transamerican appeal. (The district court certified for interlocutory appeal its order denying the Agency's motion to dismiss, and we granted permission to appeal.) For the following reasons, we affirm the district court's ruling with respect to the Agency, reverse its determination that it lacked jurisdiction over the SDR, and remand the case for proceedings on the merits.[1]
 
 I. BACKGROUND
 
 2
 In March 1981, the Agency for International Development ("AID") approved a $20 million famine relief program to ameliorate widespread starvation and malnutrition in Somalia. Under this Title II (7 U.S.C. Secs. 1721 et seq.) emergency program, the United States donated 40,000 tons of corn plus ocean transportation to Somalia. AID and the Somali government executed a Transfer Authorization Agreement to implement the emergency grain program, which specifically incorporated by reference the provisions of AID Regulation 11. Under Regulation 11, commodities shipped under Title II must be admitted duty free and exempt from all taxes, including "all customs duties, duties, tolls, taxes or governmental impositions levied on the act of importation." 22 C.F.R. Secs. 211.2(g), 211.7(b).
 
 
 3
 In April 1981, the Commodity Credit Corporation of the United States Department of Agriculture ("the Department") commissioned Transamerican to carry 5,000 tons of corn from Houston, Texas, to the Somali port of Kismayu. The Department agreed to pay $580,000 for this transportation. Upon receipt of the Somali corn in June, Transamerican issued its bill of lading in Houston and shortly thereafter contacted the Somali Shipping Agency to inform it that its ship--the M.V. Klaus Leonhardt--would arrive at Kismayu in mid-July.
 
 
 4
 Just before the scheduled arrival of the Klaus Leonhardt, the Agency telexed Transamerican and demanded $36,162.57 as a "pro forma disbursement," payable in U.S. funds to the Djibouti Branch of the Commercial and Savings Bank of Somalia (the "Somali Bank"). Transamerican objected to the amount demanded, evidently on grounds that Regulation 11 placed responsibility for such levies on the AID recipient--the Somali government. The Agency warned Transamerican, however, that the ship would be detained until the money was paid.
 
 
 5
 Transamerican then notified the Agency that it would pay the full amount, offset by $10,636.99 owed it by the Agency from previous transactions and, accordingly, transmitted $25,525.28 to the Somali Bank in Djibouti. The Agency initially claimed that it had not received the money and detained the ship following discharge of its cargo on July 26. Finally, the Agency on July 30 confirmed that it had received the money but insisted that an additional $28,312.30 be paid in order to release the ship because the initial amount demanded was "not correct." The Agency directed Transamerican to pay the amount to the Somali embassy in Washington, D.C.
 
 
 6
 According to Transamerican, the detention of the ship was costing the company approximately $10,000 per day. To secure its prompt release, a Transamerican executive personally went to the Somali embassy the next morning and presented a check for $28,312.30 payable to the Somali Shipping Agency. The embassy, however, refused to accept the check and instead directed Transamerican to electronically transfer the funds from Transamerican's New York bank into the SDR's commercial account in the Riggs National Bank in Washington. Although Transamerican complied with this demand the same day, the Agency did not release the ship until August 3. At that point the ship had been detained for a total of eight days at a cost to Transamerican of almost $100,000.[2]
 
 
 7
 When efforts to obtain redress through diplomatic channels proved unsuccessful, Transamerican sued both the SDR and the Agency in the district court. The district court granted the SDR's motion for dismissal, finding that the SDR had neither waived sovereign immunity nor engaged in commercial activities that would subject it to suit in the United States under the FSIA and therefore the court lacked subject matter jurisdiction. The district court further concluded that it had jurisdiction over Transamerican's claims against the Agency under the FSIA's commercial activity exception. Transamerican appeals the dismissal of its suit against the SDR, and the Agency appeals the denial of its motion to dismiss.
 
 II. SUBJECT MATTER JURISDICTION
 A. The Statutory Framework
 
 8
 The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. Secs. 1330, 1602 et seq. (1982), grants foreign sovereigns immunity from suit in the United States unless one of the specified statutory exceptions applies. If an exception applies, section 1330 confers subject matter jurisdiction on the district courts to hear claims against foreign states. The purpose of the FSIA is to facilitate suits in United States courts arising from the commercial conduct of foreign sovereigns. As this court has stated
 
 
 9
 [W]e think it ought to be difficult for defendants engaged in commercial activity with substantial American contact ... to invoke successfully sovereign immunity when sued for underlying commercial misdeeds. This is especially so in view of the fact that FSIA was written in great measure to ensure that "our citizens will have access to the courts in order to resolve ordinary legal disputes."
 
 
 10
 Gilson v. Republic of Ireland, 682 F.2d 1022, 1028 (D.C.Cir.1982) (quoting H.R.Rep. No. 1487, 94th Cong., 2d Sess. 6 (1976), U.S.Code Cong. & Admin.News 1976, p. 6604). See also Velidor v. L/P/G Benghazi, 653 F.2d 812, 816-17 (3d Cir.1981) (objective of Act is to facilitate suits against foreign governments in United States courts arising out of commercial activity), cert. denied, 455 U.S. 929, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982); Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 312 (2d Cir.1981) (Congress's primary concern in FSIA was providing access to courts to parties aggrieved by commercial acts of foreign sovereigns), cert. denied, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).
 
 
 11
 Thus, a foreign state may not invoke sovereign immunity in any case in which the foreign state has implicitly or explicitly waived its immunity, 28 U.S.C. Sec. 1605(a)(1), or where the claim arises from commercial activities by the foreign state. The Act provides in relevant part that
 
 
 12
 [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the action is based upon a commercial activity carried on in the United States by a foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.
 
 
 13
 28 U.S.C. Sec. 1605(a)(2). In accordance with the restrictive view of sovereign immunity reflected in the FSIA, the burden of proof in establishing the inapplicability of these exceptions is upon the party claiming immunity, in this case the SDR and the Agency. See H.R.Rep. No. 94-1487, 94th Cong., 2d Sess. 7 (1976), U.S.Code Cong. & Admin.News 1976, p. 6604. See also Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation, 730 F.2d 195, 199 (5th Cir.1984). Transamerican argues that neither the SDR nor the Agency have sustained that burden. It contends that clause 1 of the commercial activities exception applies to the SDR's claim of immunity,[3] and clause 3 applies to that of the Agency.
 
 B. The SDR
 
 14
 If the relevant activity of the Somalian embassy constituted "a commercial activity carried on in the United States by a foreign state," 28 U.S.C. Sec. 1605(a)(2) (1982), the district court has subject matter jurisdiction over Transamerican's claims against the SDR. The problem, as the drafters of the FSIA themselves admitted, is that the statute is vaguely worded and offers little guidance to courts construing its terms. See Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, 94th Cong., 2d Sess. 53 (1976). See also Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 302-03 (2d Cir.1981). The statute's most prominent ambiguity is the meaning of the term "commercial." The statutory language itself begs the question by defining "commercial activity" as either "a regular course of commercial transaction or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. Sec. 1603(d). As the Second Circuit noted, "Congress deliberately left the meaning open and ... 'put [its] faith in the U.S. courts to work out progressively, on a case-by-case basis ... the distinction between commercial and governmental.' " Texas Trading, 647 F.2d at 309 (citations omitted).
 
 
 15
 Transamerican argues that SDR's actions were not governmental, but clearly commercial in character. In support of its argument, Transamerican emphasizes that the SDR (1) agreed to serve as a conduit for the second payment, (2) refused to accept the second payment in the form of a check to the Agency, and (3) instead instructed Transamerican to deposit the payment directly into the SDR's bank account.
 
 
 16
 The district court rejected these arguments on the grounds that the SDR acted merely as a passive "stakeholder" in the transaction. Merely labelling the SDR's conduct in this transaction as that of a "stakeholder," however, cannot be determinative. The proper inquiry is whether the embassy acted in a sovereign or essentially private capacity. SDR argues that its actions were diplomatic in character, undertaken to protect its national, the Agency, and to promote friendly relations with Transamerican and, presumably, the United States. Although the embassy certainly could be viewed as "protecting" the interests of the Agency, its conduct exceeded the bounds of ordinary diplomatic behavior. The embassy did not hold the payment pending resolution of the dispute. It did not attempt to mediate the conflict or negotiate a settlement between the parties. It apparently made no attempt even to investigate the causes or merits of the dispute. Rather, the SDR actively assisted its instrumentality, the Agency, in extracting funds from Transamerican that the latter claimed it did not owe. The embassy took an active rather than a passive role in the transaction by refusing to accept payment by a check made out to the Agency and insisting instead on an electronic transfer of funds directly into SDR's own commercial bank account in Washington. Taken together, SDR's activities were essentially those of a collection agent, acting on behalf of its principal, the Agency, to wrest funds from an unwilling payor--and not that of a foreign sovereign diplomatically attempting to maintain friendly relations. In our view, it is a normal commercial function to act for another in collecting and holding funds and advising a principal as to their receipt; private banks and collection agencies do this routinely. Indeed, had the Agency not used its own government in the transaction, it could as easily have used a bank, a law firm, or any other commercial middleman representing its interests in the United States.
 
 
 17
 In addition to its characterization of the SDR as a stakeholder, the district court emphasized that the SDR's receipt of the payments resulted from its participation in the AID program and that the FSIA's legislative history shows that participation in that program would not itself amount to a commercial activity. The legislative history also makes clear, however, that "a transaction to obtain goods or services from private parties would not lose its commercial character because it was entered into in connection with an AID program." Id. The embassy's receipt of Transamerican's payment resulted from just such a transaction: the exchange of $28,000 in return for the release of the Klaus Leonhardt from the Somali port. That the ship's cargo had consisted of foodstuffs donated pursuant to the AID program is beside the point. Congress did not intend the program's mere presence in the background of a related but otherwise private commercial transaction to immunize the foreign state from the consequences of that transaction. Rather, we believe that Congress intended the phrase "a transaction to obtain goods or services ... entered into in connection with an AID program" to encompass transactions, like this one, that result from or relate to the transport of AID-related cargo by private parties.
 
 
 18
 We therefore conclude that the SDR has not sustained its burden of proving the inapplicability of the section 1605(a)(2) exception and that the Somali government has participated in commercial activity in the United States. The district court thus has subject matter jurisdiction over Transamerican's claims against the SDR under section 1330.
 
 C. The Agency
 
 19
 The district court found that it had jurisdiction to hear Transamerican's claims against the Agency because the suit was based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. Sec. 1605(a)(2). The Agency does not seriously dispute the finding that its detention of the ship and demand for payment were "commercial activit[ies] of the foreign state elsewhere."[4] Rather, the Agency claims that the activities were not sufficiently substantial to warrant the district court's conclusion that they had the requisite "direct effect" on the United States required by the statute. The district court found a direct effect in the United States because (1) Transamerican is an American corporation; (2) the Agency directed Transamerican to make payments in the United States; (3) because of the Agency's actions, a New York bank transferred funds to a Washington bank; and (4) because of the Agency's actions, Transamerican incurred additional debts to the American vessel owner.
 
 
 20
 We noted in Maritime International Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1110-11 (D.C.Cir.1982), cert. denied, --- U.S. ----, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983), that courts construing the "direct effect" language may look for guidance to section 18 of the Restatement (Second) of Foreign Relations Law of the United States (1965) concerning the extent to which a state may enact laws proscribing conduct outside its territory to prevent effects of that conduct within the state.[5] Thus, we stressed in Maritime that the effects in the United States should be both "substantial" and "direct and foreseeable" in order to satisfy the requirements of clause 3 of the section 1605(a)(2) exception.
 
 
 21
 Applying these principles to the present case, we can only conclude that the effects of the Agency's detention of the ship and demand for payment in the United States were both direct and substantial within the meaning of the FSIA. At the Agency's insistence, a significant transaction was effectuated in the United States, with an American corporation transferring $28,000 from a New York bank to the Somali government's D.C. bank. In addition, as the district court found, the continued detention caused Transamerican to incur significant additional debts to the American vessel owner to the tune of $10,000 a day in time charter costs and related charges.
 
 
 22
 The Agency's further claim that these effects on Transamerican were "unforeseeable" is entirely disingenuous. The Agency itself required Transamerican to make the payment to its embassy in Washington. Furthermore, that continued detention of the ship would cause the shipper to incur significant additional costs would be foreseeable to any party even slightly familiar with commercial shipping transactions. Cf. Maritime, 693 F.2d at 1111. We therefore find that the Agency's actions in detaining the Klaus Leonhardt until it received Transamerican's payment had a direct effect in the United States within the meaning of the FSIA and sustain the district court's holding with respect to the Agency.[6]
 
 
 23
 For the foregoing reasons, the judgment of the district court holding that it has jurisdiction over the Agency is affirmed, the judgment of the district court dismissing the action against the Somali Democratic Republic for lack of jurisdiction is reversed, and both cases are remanded to the district court for further proceedings.
 
 
 24
 So ordered.
 
 
 25
 WALD, Circuit Judge, concurring in part and concurring in the judgment:
 
 
 26
 I join the opinion of the panel except for Part II.B. I agree with the majority's conclusion in that Part that the Somali Democratic Republic (SDR) may not claim sovereign immunity in No. 84-5542, but I rely on a different ground. In my view, the SDR has implicitly waived immunity against the claims at issue here. In light of the majority's ruling, I state the reasons for my conclusion very briefly.
 
 
 27
 The Foreign Sovereign Immunities Act of 1976 (FSIA) provides that:
 
 
 28
 A foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case--
 
 
 29
 (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver....
 
 
 30
 28 U.S.C. Sec. 1605(a). The legislative history notes that:
 
 
 31
 With respect to implicit waiver, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract.
 
 
 32
 H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18 (1976) (emphasis added), reprinted in 1976 U.S.Code Cong. & Ad.News at 6617; see also S.Rep. No. 1310, 94th Cong., 2d Sess. 18 (1976).
 
 
 33
 As the majority explains, the SDR and the Department of Agriculture agreed upon the terms of the AID shipment involved in this case in a document called the Transfer Authorization Agreement. That agreement contains the following passage:
 
 
 34
 The assistance described in this authorization is hereby requested and the terms and conditions of this agreement and of AID Regulation 11, 41 F.R. 47919-47927 [sic], November 1, 1976 (attached and incorporated herein by reference), except as otherwise specifically provided herein are hereby accepted.
 
 
 35
 Record Excerpts (R.E.) at 47. Regulation 11, in turn, provides that with exceptions not relevant here, the "cooperating sponsor"--in this case, the SDR--"shall be responsible for all costs ... for demurrage, detention, and overtime." Regulation 11 Sec. 211.7(a), 41 Fed.Reg. 47,919, 47,923 (1976) (codified at 22 C.F.R. Sec. 211.7(a) (1984)). The regulation also states that "[c]ommodities shall be admitted duty free and exempt from all taxes." Id. Sec. 211.7(b) (codified at 22 C.F.R. Sec. 211.7(b) (1984)).
 
 
 36
 The question, then, is whether the SDR's contractual agreement to be bound by regulation 11, but not by the law of the United States generally, waives sovereign immunity in an action for damages allegedly caused by the SDR's violation of regulation 11. I believe that in the circumstances of this case the SDR has indeed waived immunity.
 
 
 37
 The House Report expressly relied on existing case law in support of the proposition that by submitting to the law of a particular state, a foreign country waives its immunity. In fact, however, the case law at the time did not unambiguously establish that principle.* Most of the relevant waiver cases decided before enactment of the FSIA focused on the effect of a foreign country's agreement to arbitrate disputes. "A key reason why [those] cases found that an agreement to arbitrate in the United States waived immunity from suit was that such agreements could only be effective if deemed to contemplate a role for United States courts in compelling arbitration that stalled along the way." In re Arbitration Between Maritime Int'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1103 (D.C.Cir.1982) (citations omitted), cert. denied, --- U.S. ----, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983); see also Restatement (Revised) of Foreign Relations Law of the United States Sec. 456(b) & comment b & reporter's note 2 (Tent. Draft No. 2, 1981). Courts were reluctant to permit a foreign country, after explicitly promising that it would resolve disputes before a designated tribunal in the United States, suddenly to assert after the fact that it could be held responsible for its actions, if at all, only in its own courts.
 
 
 38
 Congress obviously thought that similar reasoning supports finding a waiver of sovereign immunity when a foreign country agrees to the application of United States law. Congress evidently believed that after making such a promise, the foreign country could not equitably deny that voluntarily assumed obligations under United States law were enforceable against it. Of course, a foreign country's duties under United States law might theoretically be enforced in the foreign country's own courts. But Congress could reasonably have been skeptical that, in general, a foreign country resisting application of United States law in United States courts would be likely to yield to relief in its own courts. The courts of this country are clearly best able to interpret and apply the laws of this country.
 
 
 39
 In my view, these principles suggest that when a foreign government agrees to the application of a particular provision of federal law, that government has waived immunity in actions for violation of the law in question. By agreeing to observe regulation 11, the SDR assumed duties significantly different from those it would have undertaken if the text of regulation 11 had simply been written into the Transfer Authorization Agreement without any reference to any particular law. Had the regulation merely been written into the contract, the interpretation of its text would present an ordinary problem of contract law. But by expressly agreeing to the "terms and conditions ... of AID Regulation 11," R.E. at 47, the SDR implicitly acknowledged that regulation 11 would apply as that regulation is understood in the law of the United States. In the House Report, Congress declared that a foreign government may not assume duties generally under United States law, only to disclaim them by invoking immunity in United States courts when a controversy arises. I believe that when a foreign government assumes specific duties under United States law, it is similarly barred from denying vulnerability to suit under the provisions of law agreed to.
 
 
 40
 The district court was concerned that regulation 11 does not state to whom the SDR is liable if it violates the regulation. See Transamerican S.S. Corp. v. Somali Democratic Republic, 590 F.Supp. 962, 973 (D.D.C.1984). In a related argument, the SDR states that because the Transamerican Steamship Corporation was not a party to the Transfer Authorization Agreement, the SDR has not waived immunity in a suit brought by Transamerican. I believe that regulation 11, fairly understood, creates liability to the persons who normally sustain losses when illegal import duties are charged or demurrage costs are wrongfully imposed. Because the shipper is among those deliberately protected by regulation 11 and foreseeably harmed by any breach, Transamerican is, in effect, a third-party beneficiary of the relevant provisions in the Transfer Authorization Agreement. The district court was also concerned that regulation 11 does not state what country's laws would govern any demurrage claim. See id. at 973-74. At most, that question poses a conflict of laws problem within a framework provided by United States law; it does not change the straightforward facts that the agreement said regulation 11 applies, and regulation 11 is part of the law of the United States.
 
 
 41
 Finally, the district court relied on a passage in the House Report commenting that "a foreign state's mere participation in a foreign assistance program administered by the Agency for International Development (AID) is an activity whose essential nature is public or governmental, and it would not constitute a commercial activity." H.R.Rep. No. 1487, 97th Cong., 2d Sess. 16 (1976), reprinted in 1976 U.S.Code Cong. & Ad.News at 6615; see Transamerican S.S. Corp., 590 F.Supp. at 973. As the district court recognized, this sentence explicitly addresses only the scope of the "commercial activities" exception to immunity. I do not believe the House Report suggests that a different standard for implicit waiver should apply to contracts connected with AID shipments than to other contracts. Moreover, I do not claim that the SDR waived its immunity with respect to causes of action arising from any aspect of the AID shipment; the implicit waiver extends only to causes of action arising from breach of regulation 11.
 
 
 42
 For these reasons, I agree that the SDR is not entitled to sovereign immunity against Transamerican's claim.
 
 
 
 [1]
 We emphasize that our opinion here goes only to the jurisdictional issues of this case. Our findings are based on the facts as alleged by Transamerican and generously construed by this court. See Gilson v. Republic of Ireland, 682 F.2d 1022, 1026 (D.C.Cir.1982). We make no factual conclusions regarding the merits of the dispute
 
 
 [2]
 In addition to the out-of-pocket detention costs, cargo assessments and overcharges, Transamerican's New York bank, on August 3, 1981, inadvertently made a second, duplicate transfer of the $28,312.30 payment to the Somali embassy's commercial account in the Riggs National Bank. Transamerican alleged in its amended complaint that the Somali government refused to return this erroneous payment to plaintiff or its bank for almost a year and then did so without paying any interest and only when threatened with suit by Transamerican and its bank. (R.E. 41, 113)
 
 
 [3]
 Transamerican argues alternatively that even if the SDR was not engaged in commercial activity, the AID Transfer Authorization Agreement and the shipping documents constitute an implied waiver of sovereign immunity. The district court rejected this contention, stating that both the Transfer Authorization Agreement and the shipping document were simply aspects of SDR's participation in the AID program and noted that the FSIA's legislative history expressly states that such participation should not lead to a waiver of sovereign immunity under the commercial activity exception. Transamerican S.S. Corp. v. Somali Democratic Rep., 590 F.Supp. 968, 972 (D.D.C.1984). Because a majority of this panel finds that the commercial activity exception is applicable to SDR's activities, we have no occasion to address this question
 
 
 [4]
 A "foreign state" under the FSIA includes political subdivisions of foreign states or agencies and instrumentalities of foreign states. All parties concede that the Agency is an "instrumentality" of the SDR within the meaning of the statute. 28 U.S.C. Sec. 1603(a), (b) (1982)
 
 
 [5]
 Section 18 provides as follows:
 A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either
 (a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or
 (b)(i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems.
 
 
 [6]
 The Agency argues also that the district court lacked personal jurisdiction over it, and both the Agency and the SDR contend that the action should be dismissed for reasons of forum non conveniens. For the reasons given by the district court in its opinion, we reject these claims. See Transamerican S.S. Corp. v. Somali Democratic Republic, 590 F.Supp. 968, 976-77 (D.D.C.1984)
 
 
 *
 The SDR suggests that because Congress arguably took too broad a view of the cases when it passed the FSIA, we should disregard the statement from the legislative history discussed in text. However, "the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." Brown v. General Servs. Admin., 425 U.S. 820, 828, 96 S.Ct. 1961, 1966, 48 L.Ed.2d 402 (1976) (footnote omitted)